Filed 6/2/26  P. v. Gutierrez CA2/2

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B340158 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA103066) |
| v. | |
| CARLOS GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Teresa P. Magno, Judge.  Affirmed.

Sabrina R. Damast, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Carlos Gutierrez (defendant) appeals from the trial court's order denying his Penal Code[1] section 1473.7 motion to vacate his 2008 no contest plea to carjacking (§ 215, subd. (a)).  Because defendant has failed to meet his burden of establishing he did not meaningfully understand the immigration consequences of his plea, we affirm.

## BACKGROUND

**Statement of facts[2]**

In the early morning hours of October 3, 2008, Los Angeles County Sheriff's Deputies R. Renko and D. Barber were on patrol, when they saw defendant punch and throw a man, later identified as victim Ordonez, out of a car and drive away.  Defendant accelerated causing the "tires to squeal" and another man, later identified as victim Enriquez, to be "thrown from the vehicle and onto the street."  The deputies followed the car and conducted a traffic stop.

While Barber conducted the investigation with defendant, Renko tended to Enriquez.  As Renko approached, Enriquez yelled that defendant had stolen the car the deputies had just pulled over.  Renko found Ordonez nearby who appeared to be dazed and injured.  The two men indicated "they just wanted their vehicle back and that they would seek medical attention on their own."

---

[1]     Unless otherwise designated, all further statutory references are to the Penal Code.

[2]     We derive the statement of facts from the police report provided with defendant's motion.

Renko obtained translated statements from Enriquez and Ordonez. The men reported they had just entered their car, when defendant "opened the [driver's] door aggressively and pulled [Ordonez] out of the car." Defendant stood and punched Ordonez "numerous times in the face until [Ordonez] fell to the ground, unconscious." Defendant entered the driver's seat and, Enriquez remained in the passenger seat "frozen in fear." Defendant yelled at Enriquez, in Spanish, "to get the 'fuck' out of the car or he was going to kill [Enriquez]." After punching and pushing Enriquez in an attempt to get him out of the car, defendant put the car in "drive," opened the passenger side door, and "forcefully pushed" Enriquez from the car causing Enriquez to be "suspended out of the open door by the seat belt." As a result, defendant yelled, in Spanish, "[Y]ou're going to fucking die," as he accelerated. It was at this point deputies initiated the traffic stop.

Initially, defendant told Deputy Barber a different account. He stated Ordonez and Enriquez were his friends, though he did not know their names, and referred to them only as his "boys." He said Ordonez and Enriquez "allowed him to take the car" and he "had 'No Idea' how the victims sustained their injuries."

In a statement to Detective C. Johnson, defendant told a different version of events. Defendant said he was walking home after having "a few beers" with friends; he saw the victim getting into his car and thought the victim was a friend of his. He approached the driver's side window and realized he did not actually know the person. When the victim noticed defendant approaching his window, he cursed at defendant, making defendant angry. Defendant told the victim to get out of the car to fight him. When the victim complied, defendant noticed there was a second person in the car who also got out. Upon realizing

3

he was outnumbered, defendant "jumped into the victims['] car" and tried to drive away in an effort "to protect himself from being attacked." While defendant tried to drive the car away, the victim from the driver's side tried to stop him by punching defendant through the window. The passenger side victim tried unsuccessfully to get into the car while it was moving. Defendant was stopped by deputies as he drove away.

**Plea and sentencing**

On October 7, 2008, defendant was charged with two counts of carjacking (§ 215, subd. (a); counts 1 & 3), one count of assault with a deadly weapon, to wit, a car (§ 245, subd. (a)(1); count 2), and one count of assault by means likely to produce great bodily injury (§ 245, subd, (a)(1); count 4).

Also on October 7, 2008, during his arraignment, defendant pleaded no contest to one count of carjacking. The court sentenced him to three years in state prison.

During the plea hearing, the court advised defendant of the immigration consequences of his plea. Specifically, the court advised defendant: "If you're not a citizen of the United States, this plea will result in your deportation, denial of citizenship, and exclusion from the country." When asked if he understood that, defendant said, "Yes."[3] Defendant also indicated he understood the plea would result in a strike for purposes of the "Three Strikes" law.

**Section 1473.7 motion**

On April 25, 2024, defendant filed a motion to vacate his 2008 conviction pursuant to section 1473.7. Defendant argued

---

[3] Defendant also signed no contest plea forms, but these forms are not a part of the record on appeal.

4

his "conviction or sentence is legally invalid due to a prejudicial error … that damaged [his] ability to meaningfully understand … the actual or potential adverse immigration consequences" of his plea.  In support of the motion, defendant submitted two declarations, his own and that of, Fabian Serrato, his immigration attorney.  Defendant also provided the file notes from defendant's plea counsel, Alternate Public Defender Mimi Kim Golden; his mother's health history, indicating she was being treated for cancer in 2016 and 2017; his high school transcripts demonstrating he attended high school in Southern California from ninth through 11th grades; identification for various family members demonstrating their "lawful presence" (capitalization omitted); the 2008 four-count felony complaint, which resulted in the conviction that was the subject of the motion; the police report describing the offense; the minute order and reporter's transcript from the day of his plea.

At the request of the court, on July 26, 2024, defendant filed a supplemental brief "address[ing] the reasonable probability that [defendant] would have chosen to defend against the charges had he understood the immigration consequences." In it, defendant asserted "[t]he record overwhelming establishes, by a preponderance of the evidence, that [defendant] did not meaningfully understand the consequences of his plea" and "that he would never have entered the plea if he had known that it would subject him to mandatory deportation."  As evidence, defendant pointed to his declaration, discussed in full, *post*.

### Defendant's declaration

Defendant was born in Nicaragua in 1983.  He "was brought to the United States … in 1984, when [he] was about 10

months old."  Defendant became a lawful permanent resident of the United States in February 1992.

"Nearly [his] entire family lives in the United States," including his mother, and stepfather, who are both legal permanent residents, his biological father; along with his siblings and aunts and uncles, who are citizens of the United States.  He indicated his strong ties to the United States and lack of "significant ties" in Nicaragua.

At the time of his arrest, defendant was living with his girlfriend and working two retail jobs.  Defendant was arrested "after an altercation with two subjects forced [him] to protect [him]self from bodily injury by all means necessary." "[S]urprised" by Golden's advice to plead no contest at the his "very first court appearance," defendant "did not question" the advice "because [he] was completely reliant on her legal knowledge and expertise."  Golden "informed" him he would "avoid the maximum sentence" by pleading no contest; she handed him the plea form and "instructed [him] to sign" it.  He did so.  "Prior to entering [his] plea, Ms. Golden did not ask [him] about [his] immigration status," and "never informed [him] of the option to plead guilty to alternative charges."

He trusted Golden and "believed" and "assumed" if there were negative consequences, she would have told him.  Golden never mentioned any immigration consequences, and, as a result, he "believed there would be none."

He "was not informed that there was even a possibility that the Department of Homeland Security could revoke [his] Legal Permanent Resident status and deport [him] as a result of [his] no contest plea."  He was never informed whether Golden researched his immigration consequences or had discussed the

6

consequences with an immigration attorney, and he was never advised to consult an immigration attorney. As a result, he asserts he "was not aware that [his] no contest plea in this case would make [him] an aggravated felon under federal immigration laws, which would result in … mandatory deportation …."

He "would never have entered a no contest plea," if he knew he "would lose [his] lawful permanent resident status." Instead, he "would have insisted" his attorney "obtain an alternative change, even if it meant more jail time."

Not long after he received a January 18, 2012 notice to appear in immigration court, he filed a petition for writ of habeas corpus asserting Golden failed to inform him of the "dire immigration consequences of [his] plea." The court denied the petition finding the court who took his plea had "advised [him] of the immigration consequences." No findings were made regarding whether Golden advised defendant of the immigration consequences of his plea.

On March 7, 2013, defendant was ordered removed and he was, thereafter deported to Nicaragua. It took him a long time to "earn a decent income" in Nicaragua, "navigate the world in another country," and speak the Spanish language. He has been away from all his family for more than 10 years, including his mother who is "still under medical supervision"[4] for cancer that was diagnosed in 2016.

In 2023, defendant's mother was referred to Serrato, his immigration attorney. It was at this time defendant learned he "could have negotiated a better plea in [his] 2008 case," which

---

[4]     We note the records attached to defendant's motion are from 2016 and early 2017. There are no records demonstrating defendant's mother is "still under medical supervision" for cancer.

7

would not have resulted in "more than a decade of heartache away from [his] family."

***Serrato's declaration***

Serrato, an attorney specializing in immigration and criminal law, was retained by defendant in January 2023. Serrato reiterates much of defendant's declarations.

In addition, Serrato declares Golden "failed to inform [defendant] that a no contest plea to [carjacking] is not only a crime of moral turpitude but also a categorical crime of violence under [federal law]" and, as a result, counsel should have explained to defendant, prior to entering a plea of no contest, that "he <u>would</u> (1) be subjected to removal proceedings, (2) be mandatorily detained, (3) lose his permanent resident status, (4) not be eligible for relief from removal and (5) be banished for life from ever returning to the U.S. if deported."

Serrato acknowledged defendant "was advised of the generic immigration consequences" by the court at the time of his plea, however, Serrato argued, Golden "should have" advised defendant of "the exact immigration consequences of his plea." Serrato asserts "Golden's notes [from defendant's file] are devoid of having had a conversation about the exact immigration consequences with [defendant]."

Serrato's declaration does not point to an alternative disposition that would not have subjected defendant to immigration consequences.

***Golden's notes***

As noted, defendant filed Golden's case file notes with his motion. The notes read: "Revd chg / max / rpt w/ Δ. [¶] Stmt to Det in CJ is accurate. [¶] Revd offer w/ Δ, exp strike. [¶] Δ

8

und[5] + wanted to PNC to avoid more jail time.  [¶]  Adv Δ all rts. Δ und + waived. Adv Δ all cons. Δ und + acc.  [¶]  Δ PNC Ct. 1. 3 yrs SP."

**Section 1473.7 hearing**

The hearing on defendant's motion was held on August 2, 2024.  The People orally opposed the motion.  First, the People argued Golden's notes demonstrated "[d]efendant understood and wanted to plead no contest to avoid more jail time," Golden "advised defendant [of] all … rights" and "defendant understood and waived," Golden "advised defendant [of] all consequences" and defendant "understood and acknowledged."  Second, the People pointed to the police reports included with defendant's motion that indicate Los Angeles County Sheriff's deputies witnessed the offense in this case and averred, "given the severity of what [defendant] was facing, it's not so unusual" the case would have settled at arraignment, and "there's no indication that the D[istrict] A[ttorney] … would have entertained anything less than what … was seen by the sheriffs and experienced by the victims."  Third, the People pointed to the court's unequivocal warning that defendant's "plea will result in your deportation" and to defendant having been raised and educated in the United States and *not* being a Spanish speaker.

---

**5**     Initially, Serrato, averred "und" represented Golden's "assum[ption]" that defendant was "undocumented," which, he argued, meant Golden misunderstood defendant's legal status. However, during oral argument on the motion, the People advanced the position that "und" was shorthand for "understood." Serrato acknowledged this was likely and argued it was still favorable to defendant's position.

Serrato made five points during his oral argument. First, he argued Golden's notes saying defendant "understood" rather than "undocumented" "cut[ ] in [their] favor" because it signaled Golden was unaware defendant "was an immigrant" and therefore demonstrates defendant was not advised of the immigration consequences of his plea. Specifically, had Golden known defendant was not a United States citizen, "she would have at least taken the steps to try and avoid him being deported back to Nicaragua … a dictatorship." Second, Serrato admitted he did not request to speak to Golden and, instead, only requested Golden's "file to see what the notes indicated." Serrato said he would have spoken to Golden only "if the notes indicated that she had advised him of the immigration consequences." When asked, Serrato said the reason he did not seek a declaration or testimony from Golden was because her notes were "probably the best evidence because she is not going to recall…. [¶] She's probably had a thousand cases by then. She's not going to recall that case."

Third, Serrato argued defendant "pled out on the first day he was in court" and, according to defendant's declaration, had never spoken to Golden before, and, as such, "there wasn't enough time to research whether [defendant] would have immigration consequences," and Golden failed to fulfil her "obligation" to defendant.

Fourth, Serrato averred evidence of defendant's misunderstanding is demonstrated by defendant's declaration that he believed his lawful permanent resident status would shield him from deportation. Accordingly, Serrato argued, "irregardless [*sic*] of whether [Golden] advised him or not, if [defendant] misunderstood those consequences then that's

10

enough to establish by the preponderance of the evidence that he did not understand the actual immigration consequences of his plea."

Fifth, and finally, Serrato argued defendant suffered prejudice as a result of his misunderstanding because he lived in the United States from the time he was "ten months old," his "entire family" resided in the United States, and he would have chosen to fight the case if he knew he would lose his life in the United States.

The trial court indicated it had reviewed the motion and court file, including the plea and sentencing transcripts. The court read a portion of the 2008 plea transcript into the record, which showed defendant was orally advised that, if he was "not a citizen of the United States, this plea will result in your deportation, denial of citizenship, and exclusion from the country." Defendant asked no questions and, when asked if he understood, defendant said, "Yes."

The trial court denied defendant's motion. The court found defendant's declaration was "self-serving" and not credible. The court noted the declaration said, essentially, "I wasn't told" about the immigration consequences and the defense introduced no evidence to corroborate that claim, and, conversely the court found the plea transcript "persuasive" because it demonstrated defendant responded affirmatively when the trial court asked defendant if he understood that his plea "will result in your deportation." The court acknowledged a proper advisement by the trial court is not "dispositive but it is circumstantial evidence … going against the self-serving statement made by [defendant] that he was not told that the plea will result in the negative immigration consequences."

11

The court pointed to defendant's failure to submit testimony from Golden, and instead choosing to rely solely on her notes from the time of the plea. The trial court found Serrato's claim unpersuasive that Golden's testimony would not be helpful. The court pointed to many cases where attorneys testify to their "custom and practice" if they are unable to remember a specific case. The court noted defendant spoke English and found incredible the idea that, if defendant did not understand the consequences or Golden failed to explain them, when the "bench officer tells him that, 'Hey, you will be deported, excluded from the United States,'" defendant asked no questions and stated he understood.

The court also found there was no "indicia that the People would [have been] willing to give him something other than the charged offense." Defendant was facing a much steeper sentence, "at least 15 years," and as a result of the plea he was given three years and one strike, "a very reasonable offer considering what the maximum [wa]s."

Defendant timely appealed from the order denying his section 1473.7 motion.

## DISCUSSION

### I. Relevant law

When a noncitizen is convicted of an "aggravated felony" after having entered the United States, such person is subject to deportation and "ineligible for cancellation of removal"; as such, after suffering such a conviction, removal from the United States "is a virtual certainty" regardless of their ties. (*Sessions v. Dimaya* (2018) 584 U.S. 148, 153.) In order to protect against these harsh consequences, section 1016.5, subdivision (a) requires

12

that, prior to accepting a guilty or no contest plea, the court notify the defendant "that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."

Section 1473.7, subdivision (a)(1), allows "[a] person who is no longer in criminal custody [to] file a motion to vacate a conviction" on the ground that it "is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence."

To prevail on such a motion, "[t]he defendant must first show that he did not meaningfully understand the immigration consequences of his plea." (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).) If the defendant establishes he failed to understand the consequences of his plea, he must then show that his misunderstanding constituted prejudicial error, which "'means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.'" (*Ibid.*, quoting *People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).)

## II.    Standard of review

We independently review a trial court's order denying a section 1473.7 motion. (*Vivar*, *supra*, 11 Cal.5th at pp. 526–527.) We are "mindful that '"[i]ndependent review is *not* the equivalent of de novo review ...."'" (*Id.* at p. 527.) We exercise our independent judgment to determine whether the facts satisfy the rule of law but give deference to factual findings based on the

13

trial court's personal observations of witnesses.  (*Id.* at pp. 527–528.)  Indeed, "the independent review standard … accords substantial weight to the trial court's credibility findings …."  (*Id.* at p. 524.)  "But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court '"are in the same position,"' and no deference is owed."  (*Espinoza, supra*, 14 Cal.5th at p. 320.)

If we find defendant proved he misunderstood, we then independently review whether his lack of understanding constituted prejudicial error, "weigh[ing] all relevant circumstances, with no single factor being dispositive in our consideration of the totality."  (*Espinoza, supra*, 14 Cal.5th at p. 321.)

## III.  Analysis

Preliminarily, we note both parties have briefed the issue of whether defendant's 2024 motion was timely.  Because the question of timeliness was not advanced or discussed in the trial court, we find the issue is waived.  (See *People v. Lopez* (2022) 83 Cal.App.5th 698, 711 [issue of timeliness is waived when the People failed to oppose the motion on those grounds and the trial court made no findings as to the moving party's diligence].)

Turning to the merits, we conclude defendant has not established by a preponderance of the evidence that he did not meaningfully understand the immigration consequences of his 2008 plea.  Because defendant has not established error, we need not reach the parties' arguments regarding whether defendant established prejudice.  (See *People v. Williams* (1997) 16 Cal.4th 153, 248 ["As there was no error, we need not consider defendant's arguments respecting prejudice."].)

The trial court found defendant's declaration lacked credibility. We independently agree. (*Espinoza, supra*, 14 Cal.5th at p. 320 [no deference owed when all the findings were based on documentary evidence].) Defendant's declaration that he "was not informed that there was *even a possibility*" he could be deported "as a result of his no contest plea" is unconvincing and completely belied by the record. (Italics added.) Indeed the record reflects that at the time of his plea defendant was advised of "all" his rights and of "all" consequences of his plea, which included an unequivocal advisement from the court that he would be deported. Specifically, the court advised him that if he was not a citizen, his conviction "*will* result" in deportation, denial of citizenship, and exclusion from the country. "[Defendant] is not entitled to simply ignore the admonitions he was given about the consequences of the plea, and argue that he unilaterally assumed he would be treated in direct contravention of what he was advised orally and in writing." (*People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 663.)

Defendant also "sign[ed] the no contest forms." Though the plea form is not included in the record before this court, there is little doubt the form included an advisal regarding defendant's immigration consequences. As defendant claims he was raised in the United States from the time he was 10 months old and "did not know how … to speak the Spanish language," it seems unlikely defendant would have misunderstood the court and his counsel's advisements or have been unable to read and understand his plea forms.

We disagree with the contention Golden's notes indicated defendant "understood" "cut[] in [defendant's] favor" because it demonstrated Golden was unaware "he was an immigrant" and

15

failed to advise defendant of the immigration consequences of his plea. Golden's notes indicate she "adv[ised] Δ [of] all cons[equences]. Δ und[erstood] + acc[epted]." Because defendant was pleading no contest to a serious felony, *without evidence to the contrary*, we must assume the immigration consequences were chief among the consequences of which Golden "adv[ised]" him. Golden's notes also indicate she "Rev[iewe]d offer w/ Δ, exp[lained] strike. [¶] Δ und[erstood] + wanted to P[lead] N[o] C[ontest] *to avoid more jail time*." (Italics added.) Thus, it appears, defendant's priority at the time of his plea was reducing his prison time where he was charged with four serious and violent felonies—a priority that is understandable given the strength of the evidence against him.

To be sure, these advisements and defendant's fluency in English do not preclude a finding that defendant did not meaningfully understand the immigration consequences of his plea. (See *People v. Lopez* (2021) 66 Cal.App.5th 561, 578 ["A proper advisement by the court does not foreclose the possibility of relief when counsel provides inaccurate or incomplete advice regarding immigration consequences."]; *People v. Camacho* (2019) 32 Cal.App.5th 998, 1011, fn. 8 [defendant who had been advised his plea "'*will* result' … in adverse immigration consequences, … presented sufficient evidence of his lack of understanding such that the [trial] court's advisement [could not] be taken as irrebuttable proof that [the] defendant likely would have entered his plea notwithstanding those consequences"].) But, even if not dispositive, these advisements provide strong contemporaneous evidence defendant did, in fact, understand the immigration consequences, including that he faced *mandatory* deportation. Defendant has failed to counter this evidence.

16

In preparing defendant's motion, Serrato contacted the Alternate Public Defender's Office (APD) to secure a copy of Golden's file notes from defendant's case. Serrato did not, however, seek to speak with Golden about her recollection of defendant's case specifically and/or her 2008 "custom and practice" in advising her clients regarding immigration consequences during a plea. This may have provided compelling contemporaneous evidence regarding defendant's declaration. (See *Espinoza, supra*, 14 Cal.5th at p. 325 ["The more robust and inclusive a record, the greater the opportunity for effective persuasion and meaningful judicial review. And the inquiry into a defendant's state of mind may often involve the weighing of credibility and circumstantial evidence."].)

"[Defendant] has presented no independent evidence that he was told anything other than that he would be deported." (*People v. Abdelsalam*, *supra*, 73 Cal.App.5th at p. 664.) Therefore, considering what the contemporaneous evidence demonstrates—the unequivocal warnings defendant was given, defendant's comprehension of English, Golden's file, including the note regarding defendant's wish to avoid more jail time, the strength of the evidence against him, and the favorable disposition and sentence defendant received—we conclude defendant has not met his burden of establishing error. (*Espinoza, supra*, 14 Cal.5th at p. 321 ["Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced."]; see also *Abdelsalam, supra*, at p. 664 ["A defendant seeking to set aside a plea must do more than simply claim he did not understand the immigration consequences of the

17

plea. The claim must be corroborated by evidence beyond the defendant's self-serving statements."].)

Defendant disagrees with this conclusion, asserting the trial court erred by "reference[ing]" the "boilerplate" immigration advisal because "absent specific advice from Attorney Golden about the immigration consequences of his plea, [the advisements were] not intended to put [him] on notice of the actual immigration consequences of his plea." He contends, despite the court's warning of mandatory immigration consequences, he has demonstrated "he did not 'meaningfully understand' the immigration consequences of his plea." He points to *People v. Curiel* (2023) 92 Cal.App.5th 1160 and *People v. Manzanilla* (2022) 80 Cal.App.5th 891, 906, to support this view.

Both cases are distinguishable. In *Curiel*, during the hearing on her motion, the defendant offered the testimony of her plea counsel who "corroborated the statements in Curiel's declaration." (*People v. Curiel, supra*, 92 Cal.App.5th at p. 1177.) Here, we have no such corroboration by Golden. In *Manzanilla,* evidence from plea counsel's notes indicated she used language that specifically "avoid[ed] actually stating that deportation would ensue" and "did not explain that Manzanilla faced mandatory deportation." (*People v. Manzanilla, supra*, 80 Cal.App.5th at pp. 905–906.) Here, we have no evidence Golden failed to properly inform defendant of the immigration consequences. Instead, we have (1) Golden's notes indicating she advised defendant of "all" consequences of his plea and he accepted; (2) Golden's notes indicating defendant pleaded no contest to "avoid more jail time"; (3) the court's unequivocal warning that defendant "*will*" be deported; (4) defendant's in-court response of "Yes" when asked if he understood the court's

warning; and (5) given the seriousness of the charges against him, the fact that there was likely no outcome, short of acquittal, that would *not* have subjected defendant to deportation. Outside of his declaration saying so, defendant has provided no independent corroborating evidence to establish he misunderstood the consequences of his plea.

Because we have concluded defendant failed to establish "he did not meaningfully understand the immigration consequences of his plea," we need not address whether he suffered prejudice as a result. (*Espinoza, supra*, 14 Cal.5th at p. 319.)

## DISPOSITION

The order denying defendant's section 1473.7 motion is affirmed.

CHAVEZ, Acting P. J.

We concur:


RICHARDSON, J.


GOORVITCH, J.